UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARK NORMAN CLEARY,

       Plaintiff,

v.

COUNTY OF MACOMB, MACOMB            Case No. 06-15505
FAMILY SERVICES, INC., HENRY
FORD HEALTH SYSTEM as HENRY        Honorable Patrick J. Duggan
FORD HOSPITAL, WARREN LAMB,
individually, THERESE L. WOLF,
individually, NANCY SZEZYNGIER,
individually, CHARLES J. BARONE II,
MD, individually, and SUSAN
SCHWARTZ (n.k.a. SUSAN STADWICK),
individually,

       Defendants.
_____/


## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on September 6, 2007.

PRESENT:      THE HONORABLE PATRICK J. DUGGAN
                 U.S. DISTRICT COURT JUDGE

After spending sixteen years in confinement for a charge that was later dismissed,

Mark Norman Cleary ("Plaintiff") filed this lawsuit challenging the constitutionality of

his arrest and prosecution. In his complaint, Plaintiff asserts ten separate counts. Counts

I-II and IX allege that Plaintiff's Fourth and Fourteenth Amendment rights were violated

by Macomb County, Macomb Family Services, Inc., Henry Ford Hospital, Warren Lamb ("Lamb"), Therese L. Wolf ("Wolf"), Nancy Szlezyngier ("Szlezyngier"), and Charles J. Barone II, M.D. (" Barone") (collectively "Defendants").[1] Counts III-VIII allege various state law claims against Defendants. Count X alleges a state law claim of abuse of process against Susan Schwartz, now Stadwick ("Schwartz").[2] Presently before this Court are the following motions to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure: (1) Barone's and Henry Ford Health System's motion to dismiss; (2) Szlezyngier's motion to dismiss; (3) Macomb County's and Warren Lamb's motion to dismiss[3]; (4) Macomb Family Services, Inc.'s motion to dismiss; and (5) Wolf's motion to dismiss. Also before this Court is Barone's and Henry Ford Health System's motion for a more definite statement brought pursuant to Rule 12(e) of the Federal Rules of Civil Procedure. The Court held a hearing on these motions on May 8, 2007.

---

[1]Plaintiff's Complaint includes the following counts: Count I (Violations of the Fourth and Fourteenth Amendments); Count II (Violations of 42 U.S.C. § 1983); Count III (False Arrest); Count IV (False Imprisonment); Count V (Malicious Prosecution); Count VI (Intentional Infliction of Emotional Distress); Count VII (Negligent Infliction of Emotional Distress); Count VIII (Gross Negligence); Count IX (Constitutional Violations Defendants County of Macomb, Macomb Family Services, Inc., and/or Henry Ford Hospital); and Count X (Abuse of Process).

[2]Defendant Schwartz has not appeared in this action.

[3]Lamb's and Macomb County's motion is actually entitled a motion for summary judgment. Nevertheless, it is clear from Lamb's and Macomb County's recitation of the standard of review and from various other statements made throughout their brief that they are seeking dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Lamb & Macomb Co. Br. at 1-2, 8-9.)

# I.    Background[4]

## A.    Parties

Macomb County, Plaintiff alleges, "had the overall control and supervision of the operations of the Macomb Count Sheriff's Department . . . [and] the Child Sexual Abuse Trauma Team" ("CSATT").  (Compl. ¶¶ 6,7.)  During the time period relevant to Plaintiff's lawsuit, Lamb was "employed as a detective by Macomb County Sheriff's Department."  (*Id.* ¶ 16.)  Wolf, Szlezyngier, and Barone were all members of CSATT during the relevant time period.  Wolf was employed by Macomb Family Services, Inc. as a social worker.  Szlezyngier was "employed by the Michigan Department of Social Services of Macomb County" as a social worker.  (*Id.* ¶ 21.)  Finally, Barone was a doctor employed by Henry Ford Hospital.

## B.    Custody Dispute and Initial Allegations of Sexual Abuse

In January 1987, Plaintiff and Schwartz, Plaintiff's former girlfriend, were involved in a custody dispute where Plaintiff was seeking to obtain visitation rights to their two minor daughters, Rachael and Kristi.  On February 24, 1987, a Macomb County Friend of the Court, over Schwartz's protestations, recommended that Plaintiff receive parenting time.  Four days before this recommendation, Donna Simon ("Simon"), Schwartz's mother, "called Children's Protective Services of Macomb County" to report that Plaintiff possibly sexually abused his daughter, Rachael, "on or about February 21, 1986."  (*Id.* ¶¶

---

[4]The following facts contained in the Background section were taken from Plaintiff's Complaint and are assumed to be true for the purposes of these motions.  *Kottmyer v. Mass*, 436 F.3d 684, 688 (6th Cir. 2006).

49, 50.)

## C.     Investigation of Sexual Abuse

After receiving the report, Szlezyngier was assigned to the case.  Szlezyngier visited Schwartz's home on February 24, 1987 to interview Rachael and her younger sister, Kristi.  To learn more about the sexual abuse, Szlezyngier brought anatomically correct dolls and asked Rachael and Kristi to demonstrate the alleged sexual abuse.  Neither Rachael nor Kristi were responsive to the dolls.  Rachael, however, did tell Szlezyngier that Plaintiff had "touched her 'potty' with his hands and mouth" while Plaintiff, Rachael, and Kristi were in bed.  (*Id.* ¶ 60.)  Rachael said that Plaintiff did not touch Kristi.  During this initial interview, Szlezyngier also discovered that Rachael told Schwartz about the sexual abuse after watching a "Winnie the Pooh cartoon about strangers."  (*Id.* ¶ 61.)  After the interview, Szlezyngier called the Macomb County Sheriff's Department to report the alleged sexual abuse.

The next day, Szlezyngier told Lamb that Schwartz wanted Plaintiff prosecuted for the alleged sexual abuse.  That same day, Szlezyngier completed a CSATT "form for request for services," in which Szlezyngier stated that Kristi had also told Schwartz that Plaintiff sexually assaulted her.  On February 27, 1987, Szlezyngier contacted Barone to schedule an appointment for a physical examination of Rachael.  Szlezyngier also contacted Wolf and "informed her that the Cleary case was a hard case because of the apparent animosity [] Schwartz and [] Simon felt for Plaintiff . . . [,] which had all been expressed in front of Rachael and Kristi."  (*Id.* ¶ 69.)

On March 3, 1987, Wolf went to Schwartz's home to conduct an interview.

Rachael, Kristi, Schwartz, and Gary Schwartz, Schwartz's former husband, were all present for the interview. Schwartz described her history with Plaintiff. Schwartz indicated that she and Plaintiff had a "'rocky' relationship" and that they separated in January 1986. Schwartz stated that, while living with her, Rachael, and Kristi, Plaintiff "was abusive towards her and the children." (*Id.* ¶ 73f.) Schwartz told Wolf that in February 1987 she caught Rachael in bed with Brandon Battin, the three to four year old son of Schwartz's girlfriend, Terri Battin, "each touching their private areas." (*Id.* ¶ 73h.)

During the interview, Rachael told Wolf that she, "Kristi, and a man named Jack Swanger were all in bed together on the night of the alleged incident of February 21, 1986." (*Id.* ¶ 73i.). Rachael told Wolf that while Kristi was sleeping "Jack Swanger touched Kristi's 'potty.'" (*Id.* ¶ 73j.) Rachael also said that Plaintiff forced her to perform fellatio on him and that afterwards he "fondled her potty." (*Id.* ¶ 73k.) In addition, Rachael told Wolf that Plaintiff performed cunnilingus on her "with penile penetration." (*Id.*) Rachael "said that Jack Swanger had done the same thing to her on the night of the alleged incident." (*Id.* ¶ 73l.) Like Szlezyngier, Wolf brought anatomically correct dolls to the interview. Contrary to the lack of response Szlezyngier received a week earlier, "Rachael did a very complete and thorough job demonstrating the exact, precise positions with the anatomically correct dolls." (*Id.* ¶ 73o.) Wolf's interview lasted half an hour, and it was the only time Wolf "discussed specifics about the incident with Rachael." (*Id.* ¶ 75.)

The next day, March 4, 1987, Wolf discussed her interview with Szlezyngier who stated that she would pass on the information to Lamb. After unsuccessfully attempting

to call Schwartz on three separate occasions, Lamb received a phone call from Schwartz on March 4, 1987. Lamb scheduled an appointment to meet with Schwartz at the Sheriff's Department, which was to take place later that day. Schwartz subsequently cancelled. After cancelling, Schwartz did speak with Lamb over the telephone.

During their telephone conversation, Schwartz told Lamb that she and Plaintiff had a tumultuous relationship, which ended in January 1986. Schwartz also told Lamb that shortly after the date of the alleged incident, she discovered Rachael and Kristi playing doctor "with some children at her girlfriend's house." (*Id.* ¶ 80d.) When Schwartz disciplined Rachael for this, Schwartz told Lamb that she was surprised when "Rachael said 'daddy does it.'" (*Id.* ¶ 80f.) Schwartz discussed this with Rachael who, according to Schwartz, said that Plaintiff "put his face in Rachael's private spot and used his fingers on her." (*Id.* ¶ 80g.) Schwartz then told Lamb that she asked Rachael why she did not tell her about this earlier and Rachael responded by saying "that she did not think anything was wrong with it until after she saw a Winnie the Pooh cartoon at Terri Battin's house." (*Id.* ¶ 80h.) After Rachael's initial revelation, Schwartz told Lamb that Rachael also mentioned that two of Plaintiff's friends, Jack Swanger and Kevin McCarthy, sexually abused her. Schwartz told Lamb that Plaintiff was attempting to obtain custody of the girls and reiterated that she wanted Plaintiff prosecuted for the alleged sexual abuse. Finally, during the telephone conversation, Schwartz agreed to go to the Sheriff's Department the next day to discuss the matter in person, but this meeting never took place.

Subsequently, on March 17, 1987, Rachael began seeing Wolf for counseling.

During the initial consultation, Rachael explained to Wolf that she was afraid of going to court. Almost a week later, on March 23, 1987, Wolf contacted Szlezyngier and reported communication problems between Rachael, Simon, and Schwartz. Szlezyngier sent a letter to Lamb that same day. In the letter, Szlezyngier informed Lamb of what Rachael told her during the interview on February 24, 1987. Szlezyngier completed an investigation report on March 24, 1987. In her report, Szlezyngier stated that Schwartz adamantly wanted Plaintiff prosecuted for criminal sexual conduct charges. Szlezyngier also explained that Rachael told her that Jack Swanger also sexually abused her and that he "touched Kristi as well." (*Id.* ¶ 89d.) Szlezyngier indicated that she was concerned "that the allegations had been made as a result of a custody and visitation battle" between Plaintiff and Schwartz. (*Id.* ¶ 89e.) Szlezyngier also listed the judge presiding over the custody dispute, the case number of custody dispute, and the name of the Friend of the Court worker assigned to the case. Two days later, on March 26, 1987, Szlezyngier reported that she did not believe juvenile court intervention was necessary.

On March 30, 1987, presumably during one of their counseling sessions, Rachael gave Wolf a note, which included information that she forgot to tell Wolf. Specifically, the note stated that Plaintiff "squirted 'semen' on Rachael's candy." (*Id.* ¶ 92.)

Lamb met with Rachael, Schwartz, and Simon at Schwartz's home on April 4, 1987. Lamb recorded notes during the meeting. Lamb's notes revealed that Rachael "was very hyperactive and silly and extremely shy" and that she was unable to "relate the events of the incident." (*Id.* ¶ 94a.) Lamb learned that, on the day of the alleged incident, Rachael went to Plaintiff's mother's house, and Plaintiff later took Rachael and Kristi to his house.

While at Plaintiff's house, Rachael and Kristi watched television on the couch. Kristi fell asleep on the couch. Rachael was dressed in a t-shirt and underpants and Plaintiff had on underpants only. Although Plaintiff was drinking soda earlier in the evening, he began drinking beer later. Plaintiff gave Rachael a candy bar, but before he did, he "squirted his penis on it." (*Id.* ¶ 94h.) Plaintiff forced Rachael to eat the candy bar and then "took off his underpants and 'touched her down there.'" (*Id.* ¶ 94j.)

According to Lamb's notes, Rachael used her doll to show Lamb where Plaintiff touched her. Rachael also said that Plaintiff "used his 'potty' to touch her," Plaintiff "put his 'potty' in her mouth and into her 'potty,'" and the Plaintiff "put his 'potty' . . . in her rectum area." (*Id.* ¶¶ 94 n.-p.) Rachael told Lamb that Plaintiff told her that if she told anyone, Plaintiff would kill her, Kristi, and Schwartz. Rachael also told Lamb that Plaintiff sexually assaulted her in a similar manner on six different occasions and that on two of these occasions Plaintiff's friends, Jack Swanger and Kevin McCarthy, "were there and also touched her." (*Id.* ¶ 94t.)

On April 7, 1987, again presumably during a counseling session, Wolf, Simon, and Rachael discussed how Rachael, Schwartz, and Gary Schwartz "played court" or, in other words, conducted a mock trial with Rachael testifying as a witness. Rachael told Wolf that she felt like Schwartz was forcing her to testify. Wolf and Simon then told Rachael that Plaintiff "could get help if Rachael went to Court." (*Id.* ¶ 95.) The next day, Lamb spoke with Wolf over the telephone. Lamb told Wolf that he thought Rachael was a "weak witness" and he told Wolf to tell Schwartz to stop conducting mock trials with Rachael. (*Id.* ¶¶ 96, 97.)

A day later, on April 9, 1987, Kathleen Beard, a Macomb County prosecutor, "authorized a request for an arrest warrant on Plaintiff." (*Id.* ¶ 98.) Based on a felony complaint filed on April 14, 1987, an arrest warrant was issued on the same day. Schwartz was the complainant and signed the felony complaint. (Pl.'s Resp. Br. to Barone's Mot. to Dismiss, Exhibit A.) Schwartz was also the complainant listed on the arrest warrant. (*Id.*) Lamb was listed as a witness on both the felony complaint and arrest warrant. (*Id.*)

Two days later, April 16, 1987, Szlezyngier called Lamb stating that she received Barone's report from a physical examination he performed on Rachael on March 18, 1987. Barone's report stated: "Abnormal genital exam today. Her hymenal opening is 8-10 mm and hymenal membrane is absent on the superior aspect. Normally at this age a child's opening is 4 mm and the hymen is usually intact. This is consistent with the history that the child gives." (*Id.* ¶ 101.)

That same day, Lamb "attempted, for the first time," to contact James Connolly, the Friend of the Court assigned to Plaintiff's and Schwartz's custody dispute. (*Id.* ¶ 102.) Lamb did not reach Mr Connolly, but he left a message.

### D.     Arrest and Events Leading to Trial

On April 27, 1987, Plaintiff was arrested for criminal sexual conduct in the first degree, MICH. COMP. LAWS 750.520b(1)(a), for allegedly engaging in sexual penetration with Rachael. Plaintiff was arrested while attending a hearing scheduled in the child custody dispute at the Macomb County Circuit Court. The next day, Kathleen Beard met with Wolf, Rachael, and Simon. Rachael told Ms. Beard "that she did not want to go to

Court and was being compelled to do so." (*Id.* ¶ 107.)

Rachael underwent a psychological examination performed by Dr. Norman P. Dwaihy, Ph.D. and Debbie Jensen Capp, B.S. on May 6, 1987. The doctors' report indicated that it was based on a referral from Macomb Family Services, Inc. and Macomb County Protective Services. The reported explained that Rachael stated that Plaintiff "sexually abused her approximately one year ago." (*Id.* ¶ 111b.) Rachael also indicated that she felt uncomfortable in her environment, she distrusted adults, and she "was very hurt, angered, and confused by her mother's rejection of her." (*Id.* ¶ 111c.-i.)

On June 8, 1997, a preliminary examination was held. Rachael and Schwartz testified about the alleged incident. Plaintiff was bound over for trial on the charge of criminal sexual conduct in the first degree.

Between June 16, 1987 and July 28, 1997, Schwartz "continued to miss appointments regularly and canceled five additional appointments with [] Wolf." (*Id.* ¶ 118.)

## E. Trial

Plaintiff's trial began on January 11, 1989. Numerous witnesses testified at the trial, including: Schwartz, Rachael, Barone, Szlezyngier, Wolf, Simon, Dr. Dwaihy, and Lamb. Rachael's testimony was similar to what she told Szlezyngier, Wolf, and Lamb during their interviews. Rachael, however, indicated that she did not remember saying "daddy does it to me" and that Kristi was not in bed with her on the night of the alleged incident. Rachael testified that she "calls her vaginal area her 'private spot' not 'potty.'" (*Id.* ¶ 122.)

Barone testified that he was initially contacted to investigate sexual abuse and that Simon provided Rachael's history during the physical examination he conducted on March 18, 1987. Barone explained that his examination of Rachael's genitalia was abnormal. He found no scars or tears, but noted that Rachael's hymenal opening was 8-10 mm. He also stated that 4-7 mm was "possibly consistent with sexual abuse," but that it was not conclusive. (*Id.* ¶ 123h.)

At trial, Szlezyngier testified that she began the investigation into the alleged sexual abuse. Szlezyngier testified about her interview with Rachael. Szlezyngier also stated that motive is a consideration when sexual abuse allegations occur during a custody dispute, but that "there was never an independent investigation relative to the custody dispute." (*Id.* ¶ 124g.-h.) Szlezyngier indicated that she "only interviewed Rachael one time for 1/2 hour" and that "[s]he never spoke or attempted to speak to Plaintiff." (*Id.* ¶ 124j.-k.)

Wolf's trial testimony indicated that she was a therapist with CSATT and part of the investigation relative to Plaintiff. Wolf testified that "[s]he never discussed specifics with Rachael other than on March 3, 1987." (*Id.* ¶ 125n.) Wolf stated that "she considered the custody dispute and S.A.I.D. ('Sexual Allegations in Divorce Syndrome'), but it is nowhere in her notes." (*Id.* ¶ 125o.) According to Wolf's trial testimony, any history obtained by Wolf was provided by Schwartz.

Lamb's trial testimony indicated that he was "the chief investigating officer." (*Id.* ¶ 128b.) Lamb testified that he spoke with Rachael once on April 4, 1987. At the trial, Lamb indicated that the authorization for the warrant was sought before he received a

report from Barone. Like Szlezyngier and Wolf, Lamb testified that he was aware of the custody dispute, but "[h]e never reviewed the Friend of the Court file." (*Id.* ¶ 128h.)

The trial ended on January 13, 1989, when the jury returned a verdict of guilty.

**F.     Exoneration**

Over eight and a half years later, on August 27, 1997, Rachael testified under oath that the allegations against Plaintiff were not true. Rachael stated that none of the alleged incidents of sexual assault by Plaintiff occurred and "[t]hat she concocted the whole story from information she received from [Schwartz] and what she had seen in dirty magazines belonging to Gary Schwartz." (*See id.* ¶ 132.)

On December 14, 2004, Macomb County Circuit Judge James M. Biernat granted Plaintiff's motion for a new trial. Judge Biernat based his ruling on Rachael's sworn statement, Barone's trial testimony that there was no conclusive physical evidence of sexual abuse, the custody dispute between Plaintiff and Schwartz, and Schwartz's conduct during the investigation. (*See id.* ¶ 134.) In addition, Judge Biernat noted that "suggestive interviewing techniques were consistently used with Rachael during the investigation, contrary to accepted forensic interviewing protocol" and that Wolf's dual role as investigator and therapist was also "contrary to forensic protocol." (*Id.* ¶ 134 g.-h.)

Finally, on February 2, 2005, a pre-trial hearing was held for Plaintiff's new trial. At this hearing, "the Macomb County Prosecutor's office requested that the Court dismiss the charges against Plaintiff." (*Id.* ¶ 136.) Rachael testified at the hearing, stating that her allegations of sexual abuse involving Plaintiff were not true. (*Id.* ¶ 137.) Judge

Biernat dismissed all charges against Plaintiff on February 2, 2005.

## II.  Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint.  In deciding such a motion, "a district court must accept as true all allegations contained in the complaint and construe the complaint liberally in favor of the plaintiff."  *Kottmyer v. Mass*, 436 F.3d 684, 688 (6th Cir. 2006).  While liberal, this standard of review requires "more than the bare assertion of legal conclusions," *Columbia Natural Res. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995), and the district court need not accept as true "unwarranted factual inferences."  *Kottmyer*, 436 F.3d at 688.

## III.  Analysis

### A. Plaintiff's Abandoned Claims

At the hearing and in his responses to Defendants' motions, Plaintiff has indicated that he agrees to dismiss some of the claims Defendants seek to dismiss.  As an initial matter, Plaintiff indicates that, as to Defendants, "Plaintiff's Complaint is brought pursuant to 42 U.S.C. §[§] 1983 and 1988 for violation of the Fourth and Fourteenth Amendment to the United States Constitution."  (Wolf Resp. at 10.)  Plaintiff states that he "sought concurrence, through a proposed Stipulation with opposing counsels, in dismissing the only state claims against these Defendants, Count VI and VII."  (*Id.* at 10 n.4.)  In addition, Plaintiff states that "Counts V and VIII are not separate *state* claims as Defendant[s] contend[], but rather summarize[] and describe[] some of the Defendants' conduct and constitutional violations with certain particularity and should be read

concurrently and are inclusive with Counts I, II, and IX." (*Id.* at 2 (emphasis in original).)  Furthermore, "Plaintiff concedes that his claims of *False Arrest/False Imprisonment* are time barred." (*Id.* (emphasis in original).)  Finally, at the hearing, Plaintiff agreed to dismiss Henry Ford Health System as a party to this action.[5]

Therefore, the Court will dismiss Counts III, IV, VI, VII and Henry Ford Health System.  Consequently, the Court limits its analysis to the remaining claims Defendants' seek to dismiss and construes Counts V and VIII of Plaintiff's Complaint not as separate state causes of action, but as causes of action inclusive in Counts I, II, and IX.

Many of the individual Defendants contend that Plaintiff's claims should be dismissed against them based on identical grounds.  All Defendants argue that Plaintiff's claims are barred by the applicable statute of limitations.  In addition, Barone, Szlezyngier, and Wolf argue that they are entitled to absolute immunity.  Finally, all of the individual Defendants contend that they are entitled to qualified immunity.  The Court will deal with each of these issues together.

Macomb County argues that Plaintiff has failed to state a municipal liability claim under § 1983.  In addition to arguing that he is entitled to qualified immunity, Barone contends that he cannot be held liable because he was not acting under color of law under § 1983.  These arguments will be dealt with separately.

**B.     Whether Plaintiff's Claims Against Defendants Are Barred by the Applicable Statute of Limitations**

As stated above, Plaintiff's remaining claims against Defendants are brought

---

[5]Macomb Family Services, Inc. was dismissed by stipulation on March 14, 2007.

pursuant to 42 U.S.C. § 1983. Because there is no applicable "statute of limitations governing 1983 actions, 'federal courts must borrow the statue of limitations governing personal injury actions in the state in which the [§] 1983 action was brought." *Wolfe v. Perry*, 412 F.3d 707, 713-14 (6th Cir. 2005)(quoting *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003)). The Sixth Circuit has "held that the appropriate statute of limitations to be borrowed for § 1983 actions arising in Michigan is the state's three-year limitations period for personal injury claims." *Id.* at 714 (citing MICH. COMP. LAWS § 600.5805(10)). While federal courts borrow Michigan's three-year limitations period for personal injury claims, "the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to [Michigan] law." *Wallace v. Kato*, 127 S. Ct. 1091, 1095 (2007)(emphasis in original). Generally, "it is 'the standard rule that [accrual occurs] when the plaintiff has 'a complete and present cause of action.''" *Id.* (quoting *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201, 118 S. Ct. 542, 549 (1997)).

Plaintiff argues that he is asserting constitutional violations under both the Fourth and Fourteenth Amendments. Plaintiff contends that he has alleged a "continued detention without probable clause" claim in violation of the Fourth Amendment and due process violations under the Fourteenth Amendment, including "*Brady* violation[s] and [] fabrication of evidence claim[s] . . . ." (Pl.'s Resp. to Barone at 41-42.) Plaintiff argues that the statute of limitations did not begin to run on these claims until the charges against him were dismissed on February 2, 2005.

This Court agrees with Plaintiff. As provided in *Heck v. Humphrey*, 512 U.S. 477,

114 S. Ct. 2364 (1994), if Plaintiff would have brought his current Fourth and Fourteenth

Amendment challenges while his conviction and sentence remained in effect, such a

claim would have implied the invalidity of conviction or sentence requiring Plaintiff to

"prove that the conviction or sentence has been reversed on direct appeal, expunged by

executive order, declared invalid by a state tribunal authorized to make such

determination, or called into question by a federal court's issuance of a writ of habeas

corpus, 28 U.S.C. § 2254." *Heck*, 512 U.S. at 486-87, 114 S. Ct. at 2372. Plaintiff was

unable to make the requisite proof until February 2, 2005. Thus, the Court concludes that

Plaintiff's remaining Fourth and Fourteenth Amendment claims against Defendants

accrued on February 2, 2005. Because Plaintiff filed the present action on December 12,

2006, well within the three-year limitations period, his claims against Defendants are not

time-barred.[6]

### B.     Whether Barone, Szlezyngier, and Wolf are Entitled to Absolute Immunity[7]

---

[6]In their reply, which Plaintiff addressed in a supplemental response, Lamb and Macomb County argue that the statute of limitations bars many of Plaintiff's claims. Lamb and Macomb correctly cite the Supreme Court's recent case *Wallace v. Kato*, 127 S. Ct. 1091 (2007) for the proposition that false arrest and false imprisonment claims accrue when plaintiff is held pursuant to lawful process. *Id.* at 1100. As stated above, however, Plaintiff has agreed to dismiss any false arrest or false imprisonment claim recognizing that they are barred by *Wallace*. Furthermore, the Supreme Court in *Wallace* noted the difference between a false imprisonment claim and a malicious prosecution claim. *Id.* at 1096 (explaining "that false imprisonment consists of detention without legal process"; whereas "malicious prosecution . . . remedies detention accompanied . . by *wrongful institution* of legal process")(emphasis in original). This Court believes that the constitutional violations asserted by Plaintiff are more akin to a claim for malicious prosecution. Thus, *Wallace* is distinguishable on that basis.

[7]The Court would like to clarify that "[i]t is well-settled that witnesses are granted absolute immunity from suit for all testimony provided in judicial proceedings." *Spurlock v. Satterfield*, 167 F.3d 995, 1001 (6th Cir. 1999)(citing *Briscoe v. LaHue*, 460 U.S. 325, 330-31,

1.      <u>Applicable Law</u>

"[A]bsolute immunity protects an official from liability even when the official acted with knowledge of the constitutional violation." *Gregory v. City of Louisville*, 444 F.3d 725, 738 (6th Cir. 2005)(citing *Briscoe v. LaHue*, 460 U.S. 325, 345, 103 S. Ct. 1108, 1120-21 (1983)).  The Supreme Court has adopted a "functional approach" to determine whether a particular official is entitled to absolute immunity.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 269, 113 S. Ct. 2606, 2613 (1993).   Courts must look "to 'the nature of the function performed, not the identity of the actor who performed it." *Id.* (quoting *Forrester v. White*, 484 U.S. 219, 229, 108 S. Ct. 538, 545 (1988)).  "Those functions more 'intimately associated with the judicial phase of the criminal process' are more likely to merit careful consideration for absolute immunity." *Gregory*, 444 F.3d at 738 (quoting *Buckley*, 509 U.S. at 270, 113 S. Ct. at 2614).  In determining which functions are "intimately associated with the judicial phase of the criminal process," *id.*, "courts have made use of the distinction between prosecutorial and judicial duties and duties which are administrative or investigatory." *Achteroff v. Selvaggio*, 886 F.2d 826, 829 (6th Cir. 1989); *see also Gregory*, 444 F.3d at 738.

Barone, Szlezyngier, and Wolf contend that the Sixth Circuit's grant of absolute immunity to a private practice psychologist, psychiatrist, and social workers in *Kurzawa*

_____

103 S. Ct. 1108, 1113 (1983)).  Thus, to the extent Plaintiff asserts that Barone, Szlezyngier, Wolf, or Lamb deprived him of certain constitutional rights based on their testimony as witnesses during his trial, Barone, Szlezyngier, Wolf, and Lamb are absolutely immune from such claims.

*v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984) is equally applicable to their roles as a medical examiner and as social workers. While Barone, Szlezyngier, and Wolf correctly cite *Kurzawa* for the proposition that those officials intimately associated with the judicial process are absolutely immune, in a more recent case, the Sixth Circuit held that "the pre-trial investigatory acts by forensic examiners merit no more protection under absolute immunity than do other persons performing investigatory actions." *Gregory*, 444 F.3d at 740; *see also Achteroff*, 886 F.2d at 829. Similarly, the Sixth Circuit has held that social workers engaged primarily in an investigatory, as opposed to a prosecutorial or a judicial, function are not entitled to absolute immunity. *Achterof*, 886 F.2d at 830-31.

### 2. Whether Barone is Entitled to Absolute Immunity

In his complaint, Plaintiff alleges that Barone, a member of CSATT, was contacted by Szlezyngier to conduct a medical examination of Rachael regarding the alleged sexual abuse. (Compl. ¶ 68.) Barone testified at trial that he was contacted to "investigate sexual abuse." (*Id.* ¶ 123f.) This Court does not believe that Barone is entitled to absolute immunity for his involvement as a medical examiner charged with investigating possible sexual abuse of a child. Accepting Plaintiff's allegations as true, the Court concludes that Barone was functioning as an investigator when he examined Rachael and reported on this examination. Thus, Barone is not entitled to absolute immunity.

### 3. Whether Szlezyngier is Entitled to Absolute Immunity

Szlezyngier argues in her brief that "she was acting in her official capacity as a children's protective services worker investigating a complaint as part of her duties." (Szlezyngier Br. at 7.) Plaintiff alleges that Szlezyngier "was employed by the Michigan

Department of Social Services of Macomb County, and acted in the dual role as a social worker and de facto investigator for the Defendant COUNTY OF MACOMB and the Macomb County Sheriff's Department."  (Compl. ¶ 21.)  Thus, according to these allegations, Szlezyngier is not entitled to absolute immunity.

4.      Whether Wolf is Entitled to Absolute Immunity

Wolf argues in her brief that "she was acting in her official capacity as a children's protective services worker investigating a complaint as part of her duties."  (Szlezyngier Br. at 7.)  Plaintiff alleges that Wolf "was employed  and/or was an agent" of Macomb County and Macomb Family Services, Inc., and "acted in the dual role as a social worker and de facto investigator for [] [Macomb County] and the Macomb County Sheriff's Department."  (Compl. ¶ 18.)  Furthermore, according to Plaintiff's Complaint, Wolf testified at trial that "[s]he was part of the investigation relative to Plaintiff."  (*Id.* ¶ 125l.) Thus, according to these allegations, Wolf is not entitled to absolute immunity.

**D.      Whether Barone was Acting Under Color of Law Pursuant to § 1983**

Barone asserts that he is entitled to dismissal of Plaintiff's § 1983 claims because he was not acting "under color of law."  "A § 1983 claim must satisfy two elements: (1) the deprivation of a right secured by the Constitution or laws of the United States and (2) the deprivation was caused by a person acting under color of state law.  A plaintiff may not proceed under § 1983 against a private party no matter how discriminatory or wrongful the party's conduct."[8]  *Tahfs v. Proctor*, 316 584, 590 (6th Cir. 2003).

<hr />

[8]Section 1983 provides:
Every person, who under color of any statute, ordinance,

"The Supreme Court has developed three tests for determining the existence of state action in a particular case: (1) the public function test, (2) the state compulsion test, and (3) the symbiotic relationship or nexus test." *Chapman v. The Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003)(en banc).  Plaintiff contends that "[u]tilizing either the *public function test* or the *nexus test*, in the underlying cause of action, it can surely be said that the power exercised by Barone, as de facto pediatric examiner during Plaintiff's criminal investigation, can be fairly attributable to the state."  (Barone Resp. at 33 (emphasis in original).)  Thus, the Court will apply the public function and nexus tests to determine whether Plaintiff's Complaint sufficiently alleges that Barone acted under "color of law."

The Sixth Circuit has summarized the public function test in the following manner:

> Under the public function test, a private party is deemed a state actor if he or she exercised powers traditionally reserved exclusively to the state.  The public function test has been interpreted narrowly.  Only functions like holding elections, *see Flagg Bros. v. Brooks*, 436 U.S. 149, 157-58, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978), exercising eminent domain, *see Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352-53, 95 S. Ct. 449, 42 L. Ed. 2d 477 (1974), and operating a company-owned town, *see Marsh v. Alabama*, 326 U.S. 501, 505-09, 66 S. Ct. 276, 90 L. Ed. 265 (1946), fall under this category of action.

*Chapman*, 319 F.3d at 833-34.

---

> regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Plaintiff's Complaint reveals that Barone conducted a physical examination of Rachael and issued a General Memo containing his findings and opinions. (Compl. ¶¶ 68, 100.) Plaintiff has not provided any historical analysis in arguing that Barone performed a function traditionally reserved exclusively to the state. *See Tahfs*, 316 F.3d at 593. Furthermore, this Court believes that providing a medical opinion in an ongoing investigation of sexual abuse has not been a power traditionally reserved exclusively to the state or the County of Macomb. Thus, Barone was not acting under color of law under the public function test.

With respect to the symbiotic or nexus test, the Sixth Circuit summarized this test as follows:

> Under the symbiotic or nexus test, a section 1983 claimant must demonstrate that there is a sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the state itself.
>
> The inquiry is fact-specific, and the presence of state action is determined on a case-by-case basis. . . .

*Chapman*, 319 F.3d at 834 (internal quotations omitted). Under the symbiotic or nexus test, "it must be demonstrated that the state is intimately involved with the challenged private conduct in order for that conduct to be attributed to the state for the purposes of section 1983." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992).

Again, as stated above, Plaintiff alleges in his Complaint that Barone conducted a physical examination of Rachael and submitted a "General Memo . . . containing statements relative to the physical examination of Rachael." (Compl. ¶¶ 68, 100.) Plaintiff alleges that Barone was employed by Henry Ford Hospital and "acted in the dual

role as a physician/medical examiner and a de facto investigator for Defendant COUNTY OF MACOMB and Macomb County Sheriff's Department." (Compl. ¶ 24.) Plaintiff also alleges that Barone was a member of CSATT. (*Id.* ¶ 25.)

This Court does not believe that the challenged conduct of Barone – conducting a physical examination of a potential victim of sexual abuse and submitting a General Memo recording his findings and opinions – bears a "sufficiently close nexus between the government and the private party's conduct so that the conduct may be fairly attributed to the [County of Macomb]." *Chapman*, 319 F.3d at 834. There are no allegations in Plaintiff's Complaint that suggest that Barone communicated his findings to anyone before he submitted his General Memo on April 16, 1987, which was submitted two days after "the Honorable Herman Campbell, of the 41A Judicial District Court, issued an arrest warrant for Plaintiff []." (Compl. ¶¶ 99-100.) Rather, Plaintiff's Complaint reveals that Barone's General Memo did not play a role in securing the arrest warrant, and aside from conducting the physical examination and submitting the General Memo, Barone did nothing more than testify at trial regarding his reported findings. These alleged discrete actions of Barone fail to demonstrate that the County of Macomb was intimately involved with Barone's medical examination.

Moreover, this Court does not believe that Plaintiff's reliance on *West v. Atkins*, 487 U.S. 461, 108 S. Ct. 2250 (1988) is persuasive. The Supreme Court in *West* held that a private physician under a long-term contract with the state to provide medical care to prison inmates at a prison hospital acted under color of law under § 1983. *Id.* at 54, 108 S. Ct. at 2258. In so holding, the Supreme Court concluded that a prison medical doctor

who treats prisoners performs a function that is "fairly attributable to the State."  *Id.* at 54, 108 S. Ct. at 2258.  Here, this Court does not believe that the allegations in Plaintiff's Complaint regarding Barone's role in performing a medical examination of a victim of sexual abuse and submitting a General Memo are "fairly attributable to the State."  For similar reasons, this Court also believes that *Flint v. Ky. Dep't of Corr.*, 270 F.3d 340 (6th Cir. 2001) is unpersuasive and distinguishable.  *See id.* at 351-52 (holding that a private party who contracted with state to operate a prison print shop acted under color of law by performing functions typically attributed to the state – "housing and providing security for individuals who had been convicted of a crime and sentenced to a term of imprisonment").

Furthermore, this Court does not believe that Plaintiff's reliance on *Marsh v. S.D. County et al.*, 432 F. Supp. 2d 1035 (S.D. Cal. 2006) is persuasive.  The Court in *Marsh* held that a doctors employed by a private hospital performing an autopsy and investigating the cause of the death of a child acted under color of state law for the purposes of § 1983.  *Id.* at 1045-46.  The private doctors in *Marsh* reported directly to the district attorney and the police department.  *See id.* at 1042.  The plaintiff in *Marsh* also alleged that the private doctors conspired with the prosecutor to deprive him of his constitutional rights.  *Id.* at 1046.  In the case at bar, it is unclear who received Barone's General Memo and whether it was used as a basis to continue the detention of Plaintiff.  Moreover, according to Plaintiff's factual allegations, Barone's General Memo was not used as a basis to obtain an arrest warrant for Plaintiff because it was submitted after Ms. Beard submitted a request for the arrest warrant.  Furthermore, it was Szlezyngier who

requested that Barone conduct the medical examination and there is no allegation that Barone reported directly to the prosecutor or the Macomb County Sheriff's Department. (*See* Compl. ¶ 68.)  Nor has Plaintiff alleged that Barone conspired with the prosecutor. Thus, the Court believes that *Marsh* is distinguishable.

In conclusion, Plaintiff's § 1983 claims against Barone fail because Plaintiff's Complaint fails to allege facts that if true would demonstrate that Barone acted under color of law.  Thus, Barone will be dismissed on this basis.

### E.  Whether Barone, Szlezyngier, Lamb, and Wolf are Entitled to Qualified Immunity

Defendants Barone, Szlezyngier, Lamb, and Wolf all assert that Plaintiff has failed to allege that they deprived Plaintiff of a constitutional right and that they are entitled to qualified immunity.  As stated above, to state a viable § 1983 claim, a plaintiff must allege that he or she was deprived of a right "secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983.  Furthermore, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  Because qualified immunity renders an official immune from suit, not only from damages, the Supreme Court has encouraged courts to determine whether qualified immunity is applicable early in litigation.  *See Skousen v. Brighton High School*, 305 F.3d 520, 526-27 (6th Cir. 2002)(citations omitted).

For qualified immunity purposes, the threshold question this Court must determine

is whether: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). "If, and only if, the court finds a violation of a constitutional right, 'the next, sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case.'" *Scott v. Harris*, 127 S. Ct. 1769, 1774 (2007)(quoting *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156). Although "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," the inquiry must be made "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156.

### 1. Description of the Alleged Constitutional Deprivations

Plaintiff's Complaint alleges that Defendants deprived him of his Fourth and Fourteenth Amendment rights.[9] (Compl. Counts I & II.) At the hearing and in his response briefs, Plaintiff explained the particular theories under which he claims Defendants deprived him of his Fourth and Fourteenth Amendment rights. At the hearing, Plaintiff argued that his Complaint states continued detention without probable cause claims, claims for a *Brady* violation, and claims for a violation of his right to familial association against Defendants Barone, Szlezyngier, Wolf, and Lamb. In his response briefs, Plaintiff argues that his Complaint also alleges fabrication of evidence

---

[9]The Fourth Amendment protects private individuals against "unreasonable searches and seizures." U.S. CONST. Amend. IV. The Fourteenth Amendment protects individuals from deprivations of liberty "without due process of law." U.S. CONST. Amend. XIV.

claims against these Defendants.

Plaintiff contends that a "continued detention without probable cause" claim is cognizable under the Fourth Amendment, citing *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006). The Sixth Circuit in *Gregory* addressed whether a plaintiff in a § 1983 action can assert a claim under the Fourth Amendment for "malicious prosecution" or "continued detention without probable cause." *See id.* at 747-51. Noting that the "malicious prosecution" label for certain claims asserted under the Fourth Amendment is "somewhat of a misnomer," *id.* at 747, the Sixth Circuit held that claims alleging "continued detention without probable cause must be pursued and analyzed under the Fourth Amendment." *Id.* at 750 (emphasis in original). The Court in *Gregory* held that claims against a police officer and an examiner with the state police crime laboratory, alleging the unlawful suppression of exculpatory information and fabrication of evidence, which led to the continued detention of the plaintiff, could be brought under the Fourth Amendment. *Id.* at 750, 757-60.

Plaintiff also contends that he has adequately alleged a *Brady* violation, referring to the Supreme Court's ruling in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). The Supreme Court in *Brady* imposed a duty on the prosecution in a criminal case to disclose evidence that is both "favorable to an accused" and "material of either guilt or punishment." *Id.* at 87, 83 S. Ct. at 1196-97. Later Supreme Court cases have extended *Brady* to include impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985). Moreover, police investigators can be held liable for failing to

disclose material exculpatory or impeachment evidence when such evidence is "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438, 115 S. Ct. 1555, 1568 (1995). Interpreting *Brady* in the context of a § 1983 claim, the Sixth Circuit in *Gregory* held that a police officer and an examiner with the state police crime laboratory can be held liable under the Fourteenth Amendment due process clause for knowingly withholding exculpatory evidence. *Gregory*, 444 F.3d at 743-44. Similarly, knowingly fabricating evidence in a criminal case, "if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury," constitutes a denial of due process, and thus, such a claim is actionable as a violation of the Fourteenth Amendment. *Id.* at 745 n.8 (quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989)).

With respect to his violation of his right to familial association, Plaintiff cites *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388 (1982). The Supreme Court in *Santosky* held that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." *Id.* at 747-48, 102 S. Ct. at 1391-92. Plaintiff's Complaint is devoid of any allegations sufficient to put Defendants on notice that such a claim is being pursued. Thus, for this reason, the Court finds that Plaintiff has failed to allege a Fourteenth Amendment claim for deprivation of his constitutionally protected liberty interest in familial association against any of the Defendants.

The Court will now determine whether the facts as alleged state a Fourth

Amendment claim for continued detention without probable cause and Fourteenth

Amendment claims for withholding exculpatory evidence and fabricating evidence

against all of the Defendants.

> 2.   Whether Barone's Alleged Conduct Violated Plaintiff's Fourth and
>       Fourteenth Amendment Rights

Although the Court concluded above that Barone is entitled to dismissal in that

Plaintiff's Complaint fails to adequately allege that he was acting under color of law for

the purposes of § 1983 liability, this Court will nevertheless address whether Barone is

entitled to qualified immunity. Barone contends, in his reply brief,[10] that Plaintiff's

claims against him must be dismissed based on qualified immunity because Plaintiff has

failed to sufficiently allege that his conduct violated a constitutional right.

With respect his alleged Fourth Amendment violation against Barone, Plaintiff

contends that he is asserting a claim for continued detention without probable cause.

According to the factual allegations in Plaintiff's complaint, Barone conducted a medical

examination of Rachael on March 18, 1987, as requested by Szlezyngier, submitted a

report explaining his findings on April 16, 1987, and testified at trial about his findings.

(Compl. ¶¶ 68, 101, 123.) Plaintiff alleges that "Kathleen Beard of the Macomb County

---

[10]Although Barone only argues for the first time that he is entitled to qualified immunity
in his reply brief, he does so in response to Plaintiff's arguments in his response brief. Normally,
an argument raised for the first time in a reply brief must be disregarded by the Court.
*Resolution Trust Corp. v. Townsend Assoc. Ltd. P'ship*, 840 F. Supp. 1127, 1142 n.15 (E.D.
Mich. 1993)(citing *United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989)("[I]t is well-
settled that a party may not raise new issues for the first time in a reply brief.") It was Plaintiff,
however, who raised this argument in his response brief. Therefore, Plaintiff has had the
opportunity to address the issue.

Prosecutor's Office authorized a request for an arrest warrant on Plaintiff" on April 9, 1987. (*Id.* ¶ 98.) In addition, Plaintiff alleges that on April 14, 1987, two days before Barone submitted his report, an arrest warrant was issued for Plaintiff's arrest. (*Id.* ¶ 99.) According to the felony complaint, which is attached to Plaintiff's Response to Barone's Motion to Dismiss, Schwartz was listed as the "Victim or complainant" and Lamb was listed as a witness.[11] (Barone Resp. Ex. A.) Furthermore, after Plaintiff was arrested on April 27, 1987, a preliminary examination was held. (*Id.* ¶ 113.) At the preliminary examination, Schwartz and Rachael testified and Plaintiff was bound over for trial. (*Id.* ¶¶ 114-16.)

The Sixth Circuit in *Gregory* noted that a forensic examiner employed by the state police had "just as much, if not more in certain cases, influence over the existence of probable cause as a municipal police officer." *Gregory*, 444 F.3d at 749 n.11. Unlike the forensic examiner in *Gregory*, however, Barone could not have influenced the existence of probable cause because based on the allegations in Plaintiff's Complaint, Barone's report was submitted after the arrest warrant issued and Barone did not testify at, nor does Plaintiff allege that his report was submitted during, the preliminary examination. Consequently, Plaintiff has failed to allege facts sufficient to constitute a Fourth

---

[11]Normally, a court in a 12(b)(6) motion limits its consideration to the allegations in the complaint. Where a party attaches documents to his or her motion to dismiss or response brief, the document is "considered part of the pleadings if [it is] referred to in the plaintiff's complaint and [is] central to her claim." *Weinger v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997)(quoting *Venture Assoc. v. Zenith Data Sys.*, 987 F.2d 427, 431 (7th Cir. 1993)). Plaintiff attaches the Felony Complaint to his response brief to Barone's Motion to Dismiss. (*See* Barone Resp. Ex. A.) Because Plaintiff refers to the Felony Complaint in his complaint and it is central to his Fourth Amendment claim, (*see* Compl. ¶ 99), the Court considers it as part of the pleadings.

Amendment violation for continued detention without probable cause against Barone.

With respect to his alleged Fourteenth Amendment due process violations, Plaintiff argues that Barone withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) and fabricated evidence. Plaintiff suggests that by comparing Barone's report, which stated that his measurements of Rachael's hymenal opening were "abnormal" and were "consistent with the history that the child gives," (Compl. ¶ 110), with Barone's trial testimony, where he testified that Rachael's examination "could be considered a normal exam" and that "[h]e could not make a conclusion based on Rachael's results," (*id.* ¶ 123), it is apparent that Barone withheld exculpatory evidence.

The Court concludes that Plaintiff's allegations against Barone are insufficient to state Fourteenth Amendment claims for knowingly withholding exculpatory evidence or knowingly fabricating evidence. Unlike the forensic report utilized at trial in *Gregory*, *see Gregory*, 444 F.3d at 744, Plaintiff does not allege that Barone withheld physical evidence or fabricated the physical evidence in his report. Rather, Barone opined based on his reported physical measurements that they were "consistent with the history the child gives." (Compl. ¶ 110.) Moreover, Barone's trial testimony revealed that his examination of Rachael "could be considered a normal exam" and it was not conclusive of sexual abuse, (*id.* ¶¶ 123i.-l.), which again is distinguishable from *Gregory* where the forensic examiner testified falsely at trial about the number of "'non-matching' head hairs recovered from the pantyhose . . . ." *Gregory*, 444 F.3d at 744.

Because this Court does not believe that the facts as alleged in Plaintiff's Complaint state a constitutional violation against Barone, it need not determine whether any constitutional right was clearly established at the time of the alleged deprivation. *See Scott*, 127 S. Ct. at 1774 (stating that the second step of the qualified immunity analysis is required "[i]f, and only if, the court finds a violation of a constitutional right").

> 3.     <u>Whether Szlezyngier's Alleged Conduct Violated Plaintiff's Fourth and Fourteenth Amendment Rights</u>

Like Barone, Szlezyngier asserts that she is entitled to qualified immunity. Szlezyngier contends that she "could not have violated Plaintiff's constitutional rights because, except for her legally mandated investigation and report, her actions were too attenuated from Plaintiff's arrest and prosecution." (Szylezyngier Br. at 8.) Szlezyngier also argues that she did not arrest and prosecute Plaintiff; therefore, she cannot be liable for any Fourth Amendment violation.

Plaintiff refers to the March 23, 1987 letter Szlezyngier wrote to Lamb as the sole basis for both his Fourth Amendment continued detention without probable cause claim and Fourteenth Amendment withholding material exculpatory evidence claim. (*See* Szlezyngier Resp. Br. at 27, 32.) Plaintiff contends that his Complaint alleges that Szlezyngier had knowledge of material exculpatory facts "and that she simply failed to disclose and/or omit them in her March 23, 1987 correspondence to Lamb."[12] (*Id.* at 27.)

---

[12] Specifically, Plaintiff argues that Szlezyngier "recklessly and/or intentionally omits" the following information from her March 23, 1987 letter to Lamb:

> (1) two other alleged perpetrators and eyewitnesses to the criminal sexual conduct allegations had been identified by name, Jack

This Court believes that, accepting the facts in Plaintiff's Complaint as true, Szlezyngier's actions as they relate to Plaintiff's arrest and prosecution were too attenuated to constitute a violation of the Fourth Amendment for continued detention without probable cause and a violation of the Fourteenth Amendment for knowingly withholding exculpatory evidence.[13]  The allegations in Plaintiff's Complaint belie any possibility that Szlezyngier's withholding of material exculpatory information in her letter to Lamb caused the alleged unconstitutional detention or any other resulting deprivation of due process.  *Gregory*, 444 F.3d at 759-60 (holding that to maintain a continued detention without probable cause claim there must be "some link between the" officer's alleged wrongdoing and the continued detention); *Gazette v. City of Pontiac*, 41 F.3d 1061, 1066 (6th Cir. 1994)(holding that a close causal connection between the alleged malfeasance of a state actor and harm suffered by the plaintiff is required to sustain a § 1983 action).  All of the information Plaintiff contends was withheld by Szlezyngier in

Swanger and Kevin McCarthy; (2) there were conflicting stories as to when and how Rachael told Schwartz about the alleged sexual abuse ("Winnie the Pooh" cartoon vs. "playing doctor" at Terri Battin's house); (3) Kristi, also an alleged eyewitness to the criminal sexual conduct, gave no indications of being sexually abused herself or that she observed Rachael being sexually abused by Plaintiff; (4) there were conflicting stories as to whether Kristi was a victim herself (Michigan law mandates that every allegation of sexual abuse be investigated); and (5) there were conflicting stories as to how, where and by whom Rachael was sexually abused.

(*Id.* at 22; see also Compl. ¶ 175.)

[13]Plaintiff's Fourth Amendment claim for continued detention without probable cause and Fourteenth Amendment claim for knowingly withholding exculpatory evidence share a factual premise in that both claims rely on Szlezyngier's alleged withholding of material exculpatory evidence from her March 23, 1987 letter to Lamb.

her March 23, 1987 letter was known by Lamb by virtue of his March 4, 1987 telephone conversation with Schwartz and his April 4, 1987 interview of Rachael. (*Compare* Szlezyngier Resp. Br. at 22 and Compl. ¶ 175 *with* Compl. ¶¶ 80, 94.) Lamb obtained this information before Kathleen Beard authorized a request for the arrest warrant, presumably based in part on information provided by Lamb as he was the listed witness on the felony complaint. (*See* Barone Resp. Ex. A, Felony Complaint.) Moreover, Plaintiff does not allege that Szlezyngier testified at or that her March 23, 1987 letter was submitted during the preliminary examination. *See Gregory*, 444 F.3d at 749 n.11, 759. Thus, Plaintiff fails to state a Fourth Amendment Claim for continued detention without probable cause and a Fourteenth Amendment claim for withholding exculpatory evidence against Szlezyngier.

Because this Court does not believe that the facts as alleged in Plaintiff's Complaint state a constitutional violation against Szlezyngier, it need not determine whether any constitutional right was clearly established at the time of the alleged deprivation. *See Scott*, 127 S. Ct. at 1774.

    4. <u>Whether Wolf's Alleged Conduct Violated Plaintiff's Fourth and Fourteenth Amendment Rights</u>

Wolf also asserts that she is entitled to qualified immunity. Wolf argues that nowhere in his Complaint does "Plaintiff allege any specific act by Wolf that purportedly violated his Constitutional rights under the Fourth or Fourteenth Amendment." (Wolf Br. at 3.) Furthermore, Wolf contends that Plaintiff has failed to allege that Wolf withheld

exculpatory evidence, much less that she, as a social worker in charge of investigating sexual abuse, had a duty to disclose information under *Brady*. Wolf also argues that her role was too attenuated from Plaintiff's arrest, prosecution, and conviction to amount to a constitutional violation. Finally, Wolf contends that she did not violate Plaintiff's constitutional rights by her alleged improper interviews of Rachael.

Plaintiff responds by arguing that Wolf knowingly or recklessly withheld knowledge of exculpatory facts from Lamb and the prosecution. Plaintiff contends that Wolf repeatedly failed to follow-up on the inconsistencies in Rachael's and Schwartz's stories, presumably revealed to Wolf during her counseling sessions.[14]

According to Plaintiff's Complaint, Wolf had the most contact with Rachael. She conducted numerous "counseling sessions" with Rachael. (Compl. ¶¶ 81-82, 91-92, 95, 109.) Throughout the investigation, Wolf kept in contact with Lamb, Szlezyngier, and Kathleen Beard, furnishing information about the alleged sexual abuse she learned during her "counseling sessions."[15] (*See id.* ¶¶ 76-77, 84, 96-97, 106-07.) Wolf was the first to learn of the mock trials conducted by Schwartz and Gary Schwartz. (*Id.* ¶ 95.) At one point during one of the counseling sessions, after Rachael told Wolf that she felt like she was being compelled to testify, Wolf, along with Simon, "told Rachael that Plaintiff [] could get help if Rachael went to Court." (*Id.*)

---

[14]In this Court's opinion, Wolf's alleged failure to follow-up on inconsistencies in Rachael's and Schwartz's stories does not violate either the Fourth or Fourteenth Amendment.

[15]The repeated contact with these individuals and the fact that Wolf divulged information she learned during her counseling sessions undermines Wolf's argument that she was acting solely as a counselor to Rachael.

The allegedly exculpatory evidence Wolf learned as a result of her "counseling sessions" with Rachael, and which she allegedly withheld from Lamb and the prosecution, was information that was similar, if not identical, to the information Lamb learned during his own independent investigation. (*Compare* Compl. ¶¶ 71-75, 82, 91-92, 95 *with* ¶¶ 94.) Moreover, Plaintiff does not allege that Wolf testified at the preliminary examination. *See Gregory*, 444 F.3d at 749 n.11, 759. Consequently, Wolf's alleged withholding of such information could not have caused the detention of Plaintiff. *Gregory*, 444 F.3d at 759-60; *see also Gazette*, 41 F.3d at 1066. Furthermore, this Court does not believe that Wolf, a social worker who was not retained by the police or prosecution (and thus not a "police investigator"), can be held liable for a *Brady* violation. *See Kyles*, 514 U.S. at 438, 115 S. Ct. at 1568. In *Gregory*, the principal case relied on by Plaintiff, the forensic examiner who withheld the exculpatory evidence was employed by the police and thus was a "police investigator." *See Gregory*, 444 F.3d at 732. Finally, this Court does not believe that Plaintiff's Complaint states a Fourteenth Amendment claim against Wolf for knowingly fabricating evidence because his Complaint is devoid of any allegation that Wolf knowingly fabricated evidence.

For the reasons set forth above, Plaintiff has neither stated a Fourth Amendment claim nor a Fourteenth Amendment claim against Wolf.[16]

_____

[16]To the extent that Plaintiff alleges that Wolf violated his due process rights by improperly interviewing or counseling Rachael, this Court does not believe that such conduct violates his due process rights. *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001)(en banc)("We are also persuaded . . . that there is no constitutional due process right to have child witnesses in child sexual abuse cases interviewed in a particular manner, or to have the investigation carried out in a particular way. Interviewers of child witnesses of suspected sexual

Because this Court does not believe that the facts as alleged in Plaintiff's Complaint state a constitutional violation against Wolf, it need not determine whether any constitutional right was clearly established at the time of the alleged deprivation.[17]  *See Scott*, 127 S. Ct. at 1774.

> 5.      Whether Lamb's Alleged Conduct Violated Plaintiff's Fourth and Fourteenth Amendment Rights and/or Whether Lamb is Entitled to Qualified Immunity

Lamb argues that Plaintiff's Fourth Amendment claim against him fails because Plaintiff's "factual allegations are insufficient to state a cognizable claim of lack of probable cause for [P]laintiff's arrest and imprisonment."  (Lamb & Macomb Co. Br. At 10.)  Lamb contends that Rachael Cleary's sexual abuse accusation against Plaintiff, "standing alone," was sufficient to establish probable cause, citing *Thacker v. City of Columbus*, 328 F.3d 244, 257 (6th Cir. 2003)(quoting *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999)).  In addition, Lamb argues that there is "no duty imposed on an investigating police officer to find exculpatory evidence."  (Lamb & Macomb Co. Br. at 11 (quoting *Ahlers*, 188 F.3d at 370).)

---

abuse must be given some latitude in determining when to credit witnesses' denials and when to discount them, and we are not aware of any federal law – constitutional, decisional, or statutory – that indicates precisely where this line must be drawn.  Consequently, mere allegations that Defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as a basis for a claim under § 1983.")

[17]Suffice it to say, however, that the Court is satisfied that even if it were determined that Wolf's conduct constituted a constitutional violation, the Court is not persuaded that in 1987 it was clearly established that a reasonable official in Wolf's position would have understood that her conduct violated a person's constitutional rights.  *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156.

While, as Lamb contends, *Thacker*, quoting *Ahlers*, held that "[a victim's] accusation that she had been sexually assaulted by the plaintiff, standing alone, was sufficient to establish probable cause," *Thacker*, 328 F.3d at 257, this Court believes that both *Thacker* and *Ahlers* are distinguishable from the present case. Unlike *Thacker* and *Ahlers*, which both involved adult victims of sexual assault, this case involves a child victim who was less than ten years old at the time of the accusation and whose descriptions of sexual abuse varied temporally and substantively. (*See* Compl. ¶ 40, 60, 73, 80, 94.) Based on the facts alleged in Plaintiff's Complaint, this Court does not believe it can definitively say that a Rachael's accusation, "standing alone," is sufficient to establish probable cause. *See Ollis v. Wood*, 810 F.2d 202, 1986 U.S. App. LEXIS 33975, *7 (6th Cir. Nov. 25, 1986)(unpublished)(holding that a child sexual assault victim's "inconsistent identifications case doubt on her reliability").

According to Plaintiff's Complaint, Lamb not only received information about the alleged sexual abuse from the investigations of Szlezyngier and Wolf, but also obtained information through his independent investigation. (*See* Compl. ¶¶ 63, 76-77, 84-85, 87-88, 96-97.) Plaintiff also alleges that Lamb, the listed witness on the Felony Complaint,[18] failed to disclose material exculpatory information in his possession and "acted with reckless disregard for the truth" when he sought to obtain an arrest warrant for Plaintiff.

---

[18]In Michigan, a criminal complaint is the vehicle that "initiates the judicial phase of the prosecution and provides a basis for the issuance of an arrest warrant." *People v. Burrill*, 391 Mich. 124, 128, 214 N.W. 2d 823, 825 (1974). Moreover, Plaintiff was not detained, or seized within the meaning of the Fourth Amendment, until he was arrested, based on the arrest warrant, on April 27, 1987.

(*See id.* ¶¶ 169-70, 175; Lamb Resp. Br. Ex. C, Felony Complaint.)

Giving Plaintiff's Complaint the liberal construction to which it is entitled, this Court believes that Plaintiff has alleged facts that, if proven to be true, support his contention that Lamb knowingly withheld potentially exculpatory information resulting in the detention of Plaintiff and depriving Plaintiff of his right to a fair trial. Consequently, this Court believes that Plaintiff has stated both a Fourth Amendment claim for continued detention without probable cause and a Fourteenth Amendment claim for withholding exculpatory evidence. *Kyles*, 514 U.S. at 438, 115 S. Ct. 1568; *Gregory*, 444 F.3d at 750; *see also Sutkiewicz v. Monroe Co. Sheriff*, 110 F.3d 352, 358 (6th Cir. 1997)("[E]ven though an officer is not obligated to actively search for exculpatory evidence, when an officer is aware of exculpatory facts and circumstances, he has a duty to disclose those facts and circumstances to the prosecutor.")

Like Barone, Szlezyngier, and Wolf, however, Plaintiff's Complaint does not contain any allegation that Lamb knowingly fabricated evidence, as opposed to withholding material exculpatory information. Thus, Plaintiff has failed to state a Fourteenth Amendment fabrication of evidence claim against Lamb.

Because Plaintiff has alleged a Fourth Amendment claim for continued detention without probable cause and a Fourteenth Amendment claim for knowingly withholding exculpatory evidence against Lamb, the Court must now determine "whether the right was clearly established . . . in light of the specific context of the case." *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156. The Sixth Circuit in *Spurlock* stated that "the requirement of

probable cause is one of the cornerstones of Fourth Amendment protection" and "a reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Spurlock*, 167 F.3d at 1007 (citations omitted); *see also id.* at 1005-06 (citing *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); *Pyle v. Kansas*, 317 U.S. 213, 216, 63 S. Ct. 177, 178 (1942); *Mooney v. Holohan*, 294 U.S. 103, 112-13, 55 S. Ct. 340, 342 (1935); and *Albright v. Oliver*, 510 U.S. 266, 274, 114 S. Ct. 807, 813 (1994)).  Consequently, this Court finds that it was clearly established in 1987 that a police officer, who withheld material exculpatory information in seeking to obtain an arrest warrant and afterwards, would be on notice that he or she was violating a suspect's Fourth Amendment right to be free from an unreasonable seizure and Fourteenth Amendment right to due process.  Thus, at this stage in the proceedings, Lamb is not entitled to qualified immunity.[19]

### D. Whether Plaintiff has Properly Stated a § 1983 Claim for Municipal Liability Against Macomb County

Macomb County argues that Plaintiff's allegations are conclusory without factual support and that Plaintiff fails to point to a specific policy or custom that is allegedly

---

[19]The Court reasserts that in ruling on Lamb's motion to dismiss, the Court accepts Plaintiff's allegations as true and may grant the motion "only if it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).  Whether Plaintiff can produce sufficient evidence that Lamb, in fact, withheld material exculpatory evidence that played a part in Plaintiff's prosecution or continued detention is not before the Court at this time.

unconstitutional.[20]  In his response, Plaintiff argues that he has alleged facts supporting his claim for municipal liability against Macomb County.  Specifically, Plaintiff contends that Macomb County had unconstitutional policies of delegating law enforcement duties to "de facto" criminal investigators and failing to properly train investigators in sexual assault cases.  Furthermore, Plaintiff argues that he need only allege that the individual officers' conduct conformed to the official policy, custom, or practice and that he has done so in his Complaint.

Under § 1983, "[a] municipality may be held liable only 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.'"  *Bennett v. City of Eastpointe*, 410 F.3d 810, 818-19 (6th Cir. 2005)(quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978)).  "Furthermore, for municipal liability, there must be an 'affirmative link between the policy and the particular constitutional violation alleged.'"  *Id.* (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436 (1985)).

Count IX of Plaintiff's Complaint provides:

> 214.  Defendant[] COUNTY OF MACOMB . . . [was] vested with the authority to make policy for investigating allegations of criminal sexual abuse on a minor.
> 215.  Defendant[] COUNTY OF MACOMB . . . [was] aware

---

[20]The County of Macomb also argues that because Plaintiff has failed to state a claim for a constitutional violation against Lamb, his claim against it must also fail.  This argument is no longer viable based on the Court's conclusion that Plaintiff has alleged claims for constitutional violations against Lamb.

of a pattern of constitutional violations, as set forth above, employed by its agents and/or employees and the failure to correct said policies caused the injuries and damages to Plaintiff CLEARY as set forth above. . . .

216.  At all times relevant to this Complaint, Defendants LAMB, WOLF, BARONE, and SZLEZYNGIER were acting under the direction and control of Defendant[] COUNTY OF MACOMB . . . and were acting pursuant to the official policy, practice, or custom of said Defendants.

217.  Acting under color of law and pursuant to official, policy, practice, or custom, Defendant[] COUNTY OF MACOMB . . . intentionally, knowingly, and recklessly failed to instruct, supervise, control, and discipline, on a continuing basis, Defendants LAMB, WOLF, BARONE, and SZLEZYNGIER in their duties before, during, or after the making of an arrest. . . .

.   .   .

219.  Defendant[] COUNTY OF MACOMB . . . had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and intentionally, knowingly, or recklessly failed or refused to do so. . . .

220.  Defendant[] COUNTY OF MACOMB . . . directly or indirectly, under color of law, approved or ratified the unlawful, deliberate, malicious, reckless, and wanton conduct of Defendants LAMB, WOLF, BARONE, and SZLEZYNGIER heretofore described. . . .

(Compl. ¶¶ 214-17, 219-20.)  Furthermore, in Count II of his Complaint, which is incorporated by reference in Count IX, (*id.* ¶ 213), Plaintiff alleges that Defendants, including the County of Macomb, deprived Plaintiff of his Fourth and Fourteenth Amendment rights.  (*Id.* ¶ 183.)

This Court believes the above-referenced allegations in Plaintiff's Complaint are sufficient to withstand a Rule 12(b)(6) motion.  *See Leatherman v. Tarrant Co. Narcotics*

*Intelligence and Coordination Unit*, 507 U.S. 163, 168-69, 113 S. Ct. 1160, 1163 (1993)(rejecting the application of a heightened pleading standard for municipal liability under § 1983 and stating that "federal courts must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later").

## IV.    Conclusion

The Court concludes that the following parties and claims will be dismissed from this action.  Henry Ford Health System will be dismissed as Plaintiff has agreed to its dismissal.  Barone will be dismissed because Plaintiff's Complaint fails to adequately allege that he was acting under color of law for the purposes of § 1983.  In the alternative, Barone will be dismissed based on Plaintiff's failure to allege facts sufficient to support his contention that Barone violated the Fourth or Fourteenth Amendments to the Constitution.  Szlezyngier and Wolf will be dismissed based on Plaintiff's failure to allege facts sufficient to support his contention that they violated his rights under Fourth or Fourteenth Amendments to the Constitution.  Finally, because Plaintiff agrees to the dismissal of Counts III, IV, VI, and VII, these claims will be dismissed.

Accordingly,

**IT IS ORDERED**, that Counts III, IV, VI, and VII of Plaintiff's Complaint are **DISMISSED** in their entirety**;**

**IT IS FURTHER ORDERED** that Henry Ford System is **DISMISSED** as a party to this lawsuit**;**

**IT IS FURTHER ORDERED** that Barone's motion to dismiss is **GRANTED**

because he was not acting under the color of law and, in the alternative, Plaintiff fails to allege facts sufficient to support a Fourth or Fourteenth Amendment violation against Barone;

**IT IS FURTHER ORDERED** that because Barone and Henry Ford Health System are dismissed from this action, their motion for a more definite statement is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that Szlezyngier's motion to dismiss is **GRANTED** because Plaintiff fails to allege facts sufficient to support a Fourth or Fourteenth Amendment violation against Szlezyngier;

**IT IS FURTHER ORDERED** that Wolf's motion to dismiss is **GRANTED** because Plaintiff fails to allege facts sufficient to support a Fourth or Fourteenth Amendment violation against Wolf;

**IT IS FURTHER ORDERED** that Lamb's and Macomb County's motion to dismiss is **DENIED**.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Andre M. Sokolowski, Esq.

Claire R. Mason Lee, Esq.
Kenneth L. Lewis, Esq.
Linda M. McGrail, Esq.
Maureen T. Taylor, Esq.

Lee A. Stevens, Esq.
Cynthia A. Arcaro, Esq.