UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK NORMAN CLEARY,

       Plaintiff,

                                       Case No. 06-15505

v.

                                       Honorable Patrick J. Duggan

COUNTY OF MACOMB and WARREN
LAMB,

       Defendant,

_____/

## OPINION AND ORDER

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on March 24, 2009.

PRESENT:        THE HONORABLE PATRICK J. DUGGAN
                    U.S. DISTRICT COURT JUDGE

After spending sixteen years in confinement for a charge that was later dismissed, Mark Norman Cleary ("Plaintiff") filed this lawsuit challenging the constitutionality of his arrest and prosecution. In his December 12, 2006, complaint, Plaintiff alleged ten counts against eight defendants. After an initial series of motions, the case was reduced to Fourth and Fourteenth Amendment claims against Macomb County and Warren Lamb (collectively "defendants"). Presently before the Court is a motion for summary judgment from those remaining defendants and motions to strike exhibits from the various pleadings. For the reasons set forth below, the Court grants defendants' motion

for summary judgment and denies the motions to strike as moot.

## I. Factual and Procedural Background

This case arises from the arrest, prosecution, and conviction of Plaintiff on sexual abuse charges in the late 1980s in Macomb County, Michigan.  In early 1987, Plaintiff was engaged in a visitation dispute with Susan Schwartz regarding their two daughters, Rachael and Kristi.  While that dispute was pending, Rachael, then seven years old, told her mother that Plaintiff had sexually abused her the prior year.[1]  Donna Simon, Susan Schwartz's mother and Rachael's grandmother, reported the allegation to Macomb County Child Protection Services ("CPS") on February 20, 1987.[2]

Responding to the report, CPS caseworker Nancy Szlezyngier visited Susan Schwartz's home on February 24, 1987.  Szlezyngier interviewed both Rachael and Kristi.  Rachael indicated that Plaintiff had touched her genitals with his hands and mouth but had not touched Kristi who was asleep in the same bed at the time of the abuse.  Kristi gave no indication of abuse and neither child was receptive to using dolls to demonstrate Plaintiff's conduct.  Susan Schwartz was adamant that Plaintiff be prosecuted.  After the interview, Szlezyngier notified the Macomb County Sheriff's Department of the allegations and requested services–therapy and a physical examination–for Rachael.

On March 3, 1987, Therese Wolf, a social worker with Macomb County Services, visited Susan Schwartz's home for more interviews.  At that time, Rachael described the

---

[1]Plaintiff had not seen Rachael or Kristi in the year prior to Rachael's allegation.

[2]As will be discussed in more detail below, Simon's initial report alleged that Plaintiff had abused both Rachael and Kristi.  (Pl.'s Resp. Ex. 6.)

following sequence of events on the night of abuse: a friend of Plaintiff, Jack Swanger, touched her genitals, Plaintiff forced her to perform oral sex, Plaintiff ejaculated, Plaintiff fondled her genitals, Plaintiff performed oral sex on her, Plaintiff engaged in penile penetration, and Swanger did all the same things.[3]  On this occasion, Rachael completely and thoroughly demonstrated the abuse using "exact, precise positions with anatomically correct dolls."  (Pl.'s Resp. Ex. 24.)

Lamb, a detective with the Macomb County Sheriff's Department, made contact with Susan Schwartz on March 4, 1987.  After attempts to arrange an in-person interview failed, Susan Schwartz provided Lamb with information regarding Rachael's allegations and her relationship with Plaintiff over the phone.  (Pl.'s Resp. Ex. 18.)

In the weeks that followed the initial allegation of abuse, Rachael began seeing Wolf for counseling.  On several occasions, Wolf, Szlezyngier, and Lamb exchanged information about the case.  During this time, Rachael exhibited a fear of testifying in court and revealed that her mother and step-father, Gary Schwartz, were "playing court" with her.  Then, on March 30, 1987, Rachael allegedly provided Wolf with a handwritten note stating that "Mark squirted semen on my chest + on my candy."  (Pl.'s Resp. Ex. 21.)

Lamb interviewed Rachael and other members of the family on April 4, 1987.  Lamb described Rachael as hyperactive, silly, and shy and noted that she sometimes

_____

[3]In his complaint, Plaintiff alleges that Rachael told Wolf that Swanger touched Kristi's genitals while Kristi slept.  (Compl. ¶ 73j.)  Presumably, this allegation was derived from a statement in Wolf's report indicating that "Kristi was asleep when Jack touched her potty." (Pl.'s Resp. Ex. 24.)  Individuals involved with Plaintiff's arrest and prosecution, however, understood the "her" in the foregoing sentence to be Rachael.  (*See* Pl.'s Ex. 35 at 85.)

refused to face him when discussing the abuse allegations.  Rachael told Lamb that, on

the night of abuse, Plaintiff produced a Snickers candy bar, "squirted his penis on it," and

forced her to eat it.  (Pl.'s Resp. Ex. 18.)  Plaintiff then allegedly touched Rachael's

genital area and engaged in oral, rectal, and vaginal penetration with his penis.  Rachael

claimed that Plaintiff threatened to kill her, her sister, and her mother if she told anyone

about the abuse.  Rachael went on to say that Plaintiff had abused her on six occasions

and that, on one of those occasions, Plaintiff's friends Jack Swanger and Kevin McCarthy

did the same things.  (*Id.*)

Shortly after the April 4 interview, Lamb submitted his police report, a report from

Wolf, and a letter from Szlezyngier describing their respective interviews of Rachael in

support of a request for an arrest warrant.  On April 9, 1987, Macomb County Assistant

Prosecutor Kathleen Beard authorized Lamb's request and a felony complaint was filed

on April 14, 1987.  On that same day, an arrest warrant was issued.  On April 16, 1987,

Szlezyngier received a copy of a report regarding Rachael's physical examination which

indicated an abnormal genital exam.

On April 27, 1987, Plaintiff was arrested for criminal sexual conduct in the first

degree, Mich. Comp. Laws § 750.520b(1)(a), based on Rachael's allegations.  The next

day, Beard met with Wolf, Rachael, and Simon.  At that time, Rachael told Beard that she

felt she was being compelled to testify.  (Pl.'s Resp. Ex. 21.)

Plaintiff's criminal trial took place over a three-day span in January 1989 at which

time a jury found Plaintiff guilty of the criminal sexual conduct charge.  Plaintiff was

sentenced to 20 to 30 years in prison.  In August 1997, Rachael testified under oath that

none of the allegations she had made were true.  She explained that she had concocted the alleged sexual assaults based on information she received from her mother and from what she had seen in dirty magazines belonging to her step-father.  On December, 14, 2004, a Macomb County Circuit Court judge granted Plaintiff's motion for a new trial.  On February 2, 2005, the Macomb County Prosecutor's office moved to dismiss the charges against Plaintiff based on Rachael's recantation.  The motion was granted.[4]

Plaintiff filed the instant lawsuit on December 12, 2006, alleging that Macomb County, Macomb County Services, Inc.,[5] Henry Ford Health System,[6] Lamb, Wolf, Szlezyngier, Charles Barone,[7] and Susan Schwartz violated his constitutional rights and committed a variety of state torts.  After an initial series of motions to dismiss from various defendants, the case was reduced to claims against Macomb County, Lamb, and Susan Schwartz.  (Sept. 6, 2007, Opinion and Order, Doc. No. 35.)  On September 18, 2007, Plaintiff voluntarily dismissed Susan Schwartz from the case.

Plaintiff's remaining claims against Macomb County and Lamb allege Fourth and Fourteenth Amendment violations actionable under 42 U.S.C. § 1983.  As noted above, Macomb County and Lamb filed the motion for summary judgment presently pending

---

[4]For more detailed information regarding Plaintiff's criminal trial and exoneration, the Court refers readers to its previous Opinion and Order filed September 6, 2007, where the Court set forth a more detailed rendition of the facts as reconstructed from the Plaintiff's complaint. (Doc. No. 35.)

[5]Macomb County Services, Inc., employed Wolf.

[6]Henry Ford Health System employed the doctor who conducted Rachael's physical examination.

[7]Charles Barone was the physician who conducted Rachael's physical examination.

before the Court on October 10, 2007.  After the motion was filed, the parties engaged in limited discovery regarding the issues raised in the motion.  Limited discovery closed on December 31, 2008, and the motion has now been fully briefed.  On March 6, 2009, defendants filed a motion to strike three of the exhibits attached to Plaintiff's response to the summary judgment motion.  That motion has also been fully briefed.  Finally, Plaintiff filed a sur-reply on March 13, 2009, in which he requested that the Court strike two exhibits attached to Defendants' reply brief.  Pursuant to Eastern District of Michigan Local Rule 7.1(e)(2), the Court dispensed with oral argument for these motions on March 19, 2009.  As necessary, the Court will include additional facts in the legal analysis below.

## II. Standard of Review

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323.  Once the movant meets this burden, the non-movant must

come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## III. Claims Against Defendant Lamb

To establish a 42 U.S.C. § 1983 claim against Lamb, Plaintiff must set forth facts demonstrating "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). "[G]overnment officials performing discretionary functions" are shielded by qualified immunity from § 1983 liability, however, "if they violate an individual's constitutional rights, but the violated right was not 'clearly established' at the time of the official's actions." *Marvin v. City of Taylor*, 509 F.3d 234, 243 (6th Cir. 2007). Lamb defends against Plaintiff's § 1983 claims by asserting that he is entitled to qualified immunity.

To analyze Lamb's claim of qualified immunity, the Court applies a three-part test:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the

> violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence "to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."

*Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). The question of qualified immunity must be submitted to a jury, however, if "the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989).

Plaintiff's § 1983 claims against Lamb involve Lamb's alleged withholding of exculpatory and impeachment evidence. Insofar as the alleged withholding of evidence facilitated the issuance of an arrest warrant in the absence of probable cause, Plaintiff claims a violation of his Fourth Amendment rights. *See Gregory v. City of Louisville*, 444 F.3d 725, 750 (6th Cir. 2006) (explaining that a Fourth Amendment claim for continued detention without probable cause can be rooted in a claim that an officer withheld exculpatory evidence). Insofar as the alleged withholding of evidence prevented Plaintiff from receiving a fair trial, Plaintiff claims a violation of his Fourteenth Amendment rights. *See id.* (acknowledging that *Brady* violations are actionable under 42 U.S.C. § 1983 as due process violations). While based on the same underlying facts, these claims require separate proofs which the Court will address in turn.

## A. Fourth Amendment: Continued Detention without Probable Cause

To succeed on his Fourth Amendment claim, Plaintiff must first establish that Lamb secured the arrest warrant and pursued charges in the absence of probable cause. As an initial matter, Lamb asserts that Plaintiff is barred from taking this position because of the

doctrine of collateral estoppel.[8]  According to Lamb, the Michigan trial court's finding of

probable cause at the preliminary examination hearing is binding on Plaintiff in this

litigation.  *See Coogan v. City of Wixom*, 820 F.2d 170, 175 (6th Cir. 1987), overruled on

other grounds by *Frantz v. Vill. of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001) ("[W]here

the state affords an opportunity for an accused to contest probable cause at a preliminary

hearing and the accused does so, a finding of probable cause by the examining magistrate

or state judge should foreclose relitigation of that finding in a subsequent § 1983

action.").

Given the nature of Plaintiff's claim–that Lamb withheld exculpatory and

impeachment evidence that would have prevented the state court from finding probable

cause–collateral estoppel is inapplicable to this case.  "Police officers cannot, in good

faith, rely on a judicial determination of probable cause when that determination was

premised on an officer's own material misrepresentations to the court."  *Gregory*, 444

F.3d at 758.  This is because "deliberate obfuscation or omission of material facts by an

investigator at the preliminary hearing makes the investigator's subsequent reliance on

---

[8]Lamb did not raise the issue of collateral estoppel until the filing of his reply brief.
Although an argument raised for the first time in a reply brief must normally be disregarded by
the Court, *Resolution Trust Corp. v. Townsend Assoc. Ltd. P'ship*, 840 F. Supp. 1127, 1142 n.15
(E.D. Mich. 1993), Lamb asserts that the relevance of the doctrine of collateral estoppel did not
become clear until Plaintiff filed his response brief.  Given that both parties and this Court have
previously identified Plaintiff's claim as one for "continued detention *without probable cause*,"
the Court cannot agree that the issue of collateral estoppel only became relevant upon the filing
of Plaintiff's response brief.  The Court nonetheless addresses Lamb's argument because
Plaintiff responded to Lamb's argument in his sur-reply brief.

the hearing's conclusions unreasonable."[9]  *Id.*  Therefore, Plaintiff is free to argue in this case that Lamb lacked probable cause when he pursued the charges against Plaintiff.

Returning to the first inquiry in the qualified immunity analysis, Plaintiff must establish a constitutional violation by showing that Lamb lacked probable cause to pursue the charges against him.  "Probable cause exists where 'the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."  *Canter v. Hardy*, 188 F. Supp. 2d 773, 788 (E.D. Mich. 2002) (quoting *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 1310-11 (1964)).

An eyewitness account of a criminal offense that identifies the perpetrator is generally sufficient to establish probable cause "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation."  *Canter*, 188 F. Supp. 2d at 789; *see also Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999).  "Interviewers of child witnesses of suspected sexual abuse must be given some latitude in determining when to credit . . . and when to discount them . . . ."  *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001).  In that

---

[9]A simple allegation that an investigator withheld evidence from the state trial court may be insufficient to avoid the doctrine of collateral estoppel where the same evidence was within the knowledge of the state court defendant and that defendant had the opportunity to bring the evidence to the state court's attention.  *Molnar v. Care House*, 574 F. Supp. 2d 772, 791 (E.D. Mich. 2008).  In this case, however, Plaintiff alleges that Lamb withheld evidence from both the state trial court and Plaintiff.

regard, there is no "federal law–constitutional, decisional, or statutory–that indicates precisely where the line must be drawn." *Id.* To establish a lack of probable cause in the face of a child's claim of sexual abuse, "[w]hat is required is an allegation or a showing that the interviewer knew or should have known that the alleged perpetrator was innocent . . . ." *Id.* at 1077.

Applying these principles to the present case, Plaintiff argues that the facts and circumstances within Lamb's knowledge failed to establish probable cause to believe that Plaintiff had sexually abused his daughter. Among other things, Plaintiff argues that the inconsistencies in Rachael's statements, Rachael's fear of testifying in court, and the acrimonious relationship and visitation dispute between Plaintiff and Rachael's mother provided reason to distrust Rachael's allegations, and that Lamb unreasonably ignored those facts and circumstances and withheld them from the state trial court to secure a finding of probable cause.[10]

Viewing the facts with the benefit of hindsight, the Court shares in Plaintiff's concerns regarding the credibility of Rachael's allegations in light of all the facts and circumstances. In the month between the initial report of abuse and the issuance of the arrest warrant, the gravity of Rachael's allegations consistently increased. For example,

---

[10]Plaintiff lodges numerous other complaints regarding Lamb's conduct during the investigation. The Court has focused on this limited list of complaints, however, because these allegations refer to facts and circumstances allegedly known by Lamb. Complaints regarding the thoroughness of Lamb's investigation are not actionable. *See Molnar*, 574 F. Supp. 2d at 793 ("The question [for a court reviewing a question of probable cause] is whether the evidence in totality, known to the officers at the time of arrest, would lead an objectively reasonable officer to conclude there was probable cause, not whether a professional and thorough investigation had been conducted."); *see also Devereaux*, 263 F.3d at 1075.

Rachael's initial allegation that Plaintiff had touched her genital area with his mouth and hands changed over time to include claims that Plaintiff engaged in penile penetration, forced her to perform oral sex, and forced her to eat a candy bar covered in his semen. These changes combined with the mother's apparent motive to have the child fabricate allegations of abuse cast doubt on Rachael's credibility.

Nonetheless, the Court declines to interfere with the discretion Lamb should be accorded in analyzing Rachael's allegations and concludes that he had probable cause to pursue the charges against Plaintiff. As will be discussed in more detail below, the documents submitted in support of the request for the arrest warrant revealed the most suspicious aspect of Rachael's allegations–her inconsistency over time–but a prosecutor and a Michigan judge nonetheless agreed with Lamb's conclusion that there was probable cause to support Plaintiff's arrest. At worst, the Court believes that, considering *all* of the facts and circumstances of this case as of January 1989, the finding of probable cause could have gone either way. As such the Court cannot conclude that Lamb knew or should have known that Plaintiff was innocent. Therefore, Plaintiff has failed to establish that Lamb's conduct caused him to be detained without probable cause and Lamb is entitled to summary judgment on this claim.

**B. Fourteenth Amendment: Withholding Exculpatory Evidence**

In his remaining § 1983 claim against Lamb, Plaintiff alleges that Lamb violated his Fourteenth Amendment due process right to a fair trial by withholding exculpatory and impeachment evidence that would have led to an acquittal. "Law enforcement officials are constitutionally required to turn over 'material' exculpatory evidence." *Molnar*, 574

F. Supp. 2d at 794.  In the context of this rule, "exculpatory evidence" includes impeachment evidence.  *See United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985).  To establish a constitutional violation of this nature, a plaintiff must demonstrate: (1) that the evidence was actually within the knowledge of the law enforcement officer, (2) that the evidence was actually withheld, (3) that the evidence was favorable to him or her, and (4) that the evidence was material.  *See Molnar*, 574 F. Supp. 2d at 795.  For each piece of evidence allegedly withheld by Lamb, Plaintiff fails to meet his evidentiary burden.

In his response to the motion for summary judgment, Plaintiff provides several laundry lists of evidence allegedly withheld by Lamb during the course of the investigation and trial.  Included in these lists, however, are a large number of facts and circumstances of which Plaintiff would have had knowledge during his prosecution.  For example, Plaintiff alleges that Lamb withheld information regarding the visitation dispute and acrimonious relationship between himself and Susan Schwartz.  As a party to the visitation dispute and the acrimonious relationship, however, Plaintiff cannot assert that such information was actually withheld from him.  Other pieces of evidence about which Plaintiff complains, such as a psychological report and the results of the physical examination of Rachael, were introduced during Plaintiff's 1989 trial.  (*See* Pl.'s Resp. Ex. 1 at 16-17, Ex. 15, Ex. 19.)  If the evidence was presented at trial, it was not actually withheld.

Similarly, Plaintiff alleges that Lamb withheld other pieces of information that clearly appear in the police report that Lamb submitted for purposes of obtaining the

arrest warrant.  Lamb's police report discusses how Rachael came to reveal the alleged abuse,[11] identifies Jack Swanger and Kevin McCarthy as other alleged perpetrators, states that Rachael sometimes acted shy or refused to answer questions when being interviewed, and indicates that Wolf was assisting in the investigation in addition to serving as Rachael's therapist.  More importantly, though, Lamb's police report reveals that Rachael's allegations were changing over time: Rachael initially reported to her mother that Plaintiff touched her genitals with his mouth and fingers, but told Lamb a month later that Plaintiff made her eat a Snickers bar with semen on it; touched her genital area; engaged in oral, rectal, and vaginal penetration with his penis; and threatened to kill her, her sister, and her mother if she revealed the abuse.[12]  Rachael also told Lamb that she had endured sexual abuse of this nature on six different occasions.  (Pl.'s Resp. Ex. 18.)  Because all of this information appeared in Lamb's police report and because Lamb submitted his police report to the court when seeking the arrest warrant, this evidence was not actually withheld.

Another grouping of Plaintiff's complaints involves evidence that is either not favorable or not materially exculpatory.  Plaintiff takes particular issue with Lamb's

---

[11]Plaintiff complains that Lamb failed to disclose that Rachael gave inconsistent explanations for why she made her allegations a year after the abuse, sometimes stating that she revealed the abuse after being caught playing "doctor" with another child and sometimes stating that she learned that what her father did was wrong after watching a "Winnie the Pooh" cartoon. Lamb's police report discusses the role of both of these events in eliciting the allegations.

[12]Lamb also submitted Wolf's intake evaluation in support of his application for an arrest warrant.  Wolf's evaluation contains yet another description of the alleged sexual abuse. Together these documents establish that Rachael's allegations became increasingly serious over time.

14

alleged withholding of evidence that the initial complaint identified both Rachael *and Kristi* as victims of the sexual abuse but that the allegation that Kristi had been abused subsequently proved false. Plaintiff claims he could have used this information to impeach Rachael's claim that she was abused. Ultimately, Plaintiff makes much ado about nothing. The document that identifies Kristi as a victim is the CPS intake sheet. The information contained in the CPS intake sheet was reported by Simon, not Rachael. (Pl.'s Resp. Ex. 6.) From her first interview with Szlezyngier and going forward, Rachael consistently reported that only she had been abused by Plaintiff and that, although Kristi was present, Kristi had been asleep during the abuse. (*See* Pl.'s Resp. Ex. 13 at 36.) Whatever Simon might have said in the hours after Rachael's initial disclosure does not materially impact the credibility of Rachael's allegations.

Plaintiff's claims regarding Rachael's use of dolls to describe the abuse succumb to a similar analysis. The documents submitted in support of the arrest warrant reveal that, in her initial interview, Rachael refused to use anatomically correct dolls to describe the abuse. (Pl.'s Resp. Ex. 33.) A few days later, however, Rachael allegedly "did a very complete and thorough job of demonstrating exact, precise positions with the dolls." (Pl.'s Resp. Ex. 24.) Then, Lamb reported that Rachael brought dolls to her interview so she could describe the abuse. (Pl.'s Resp. Ex. 18.) Plaintiff, however, alleges that Lamb provided dolls for Rachael to use and lied about Rachael bringing the dolls to bolster the allegations. Ultimately, Plaintiff could have impeached Rachael's testimony by pointing out her inconsistent use of the dolls during the interviews regardless of who provided the dolls. Given that Rachael had been previously unreceptive to using dolls, Lamb's

notation that Rachael used "her doll" to describe the abuse did not logically increase Rachael's credibility–if anything, it made Rachael's allegations more suspicious. Under these circumstances, nothing about Rachael's interaction with dolls–or Lamb's reporting thereof–can be said to have deprived Plaintiff a fair trial.

Plaintiff next alleges that Lamb violated his rights by withholding evidence that Rachael was afraid of testifying in court and that her mother and step-father had been "playing court" with her.[13] Even if such evidence was actually withheld,[14] the information is not so clearly favorable or materially exculpatory to support a constitutional claim. Evidence that Rachael was afraid of testifying and played court with her family does not, standing alone, indicate that Rachael was lying. On its face, this information reflects the not so surprising fact that a young child feared involvement with the legal system.

To the extent that Plaintiff asserts that he would have argued the more sinister

---

[13]In his brief, Plaintiff quotes Rachael as saying that she was "afraid of going to jail if she lies." (Pl.'s Resp. at 11 (emphasis in original).) After reviewing the exhibit cited in support, the Court notes that Rachael actually indicated fear of going to jail if she "makes a mistake." (Pl.'s Resp. Ex. 21 at 5.) In the Court's opinion, there is a significant distinction between the two statements.

[14]It is possible that Plaintiff was aware of these facts at the time of his prosecution. A discovery order prior to the criminal trial ordered the prosecution to hand over "[a]ll statements notes and reports prepared by all therapist [sic], particularly . . . Nancy Szlezyngier . . . ." (Defs.' Mot. Ex. H.) Szlezyngier prepared a "Protective Services Narrative Closure" report that indicated that Rachael was suffering from hysteria and anxiety regarding the court proceedings and that Susan and Gary Schwartz had exacerbated the problem by conducting "mock trials" with Rachael. (Pl.'s Resp. Ex. 43.) If Plaintiff received this report as part of the discovery for his criminal trial, the evidence was not actually withheld. The Court does not rely on this possibility, however, because defense counsel has failed to present evidence identifying precisely what items and documents were handed over other than the generic and broad discovery order cited above.

implications of this information–that Rachael's fear reflected a guilty conscience or that Rachael's mother and step-father were coaching Rachael to lie–the information was cumulative to other impeachment evidence available to Plaintiff.  Lamb disclosed in his police report that Rachael acted shy and sometimes refused to face him when discussing the allegations of abuse.  Plaintiff could have used this information to establish Rachael's fear and imply that Rachael was lying or had a guilty conscience about her accusations. Similarly, Plaintiff knew that Susan Schwartz had a motive to encourage Rachael to lie about the allegations because of the visitation dispute and also knew that Rachael's allegations changed over time, becoming increasingly depraved and bizarre.  Given this disclosed evidence, Plaintiff did not need evidence that Rachael played court to develop the theme that Rachael was lying pursuant to the encouragement of her mother.

Finally, Plaintiff has failed to present evidence that Lamb actually knew of some of the evidence that was allegedly withheld.  Plaintiff alleges that Lamb withheld evidence that Rachael wrote a note correctly using and spelling the words "penis" and "semen." Although Plaintiff has submitted evidence indicating that Wolf received a note from Rachael containing these words, the record is lacking evidence that Lamb ever saw or had possession of the note.[15]  Similarly, Plaintiff has failed to present evidence indicating that Lamb was aware that Rachael made allegations in 1988 that her mother and step-father

---

[15]Lamb admitted during his deposition that he was aware of Rachael's statement that Plaintiff had "squirted his penis" on a Snicker's candy bar but denied seeing the note that allegedly read, "Mark squirted semen on my chest + on my candy."  (Pl.'s Resp. Ex. 21, Ex. 27 at 244.)  Wolf allegedly transcribed the content of the note into her case file.  If the actual note was preserved, it has not been presented to this Court.

were physically abusing her. Plaintiff has presented evidence that the policies of CPS required caseworkers to report violations of the penal code to law enforcement. Plaintiff has not presented evidence, however, that Rachael's 1988 allegations rose to the level of criminal violations or that Lamb would have been the law enforcement officer notified had the allegations been reported to law enforcement.[16] Therefore these claims fail based on the lack of evidence that the information was actually within Lamb's knowledge.

Plaintiff's brief sets forth an almost overwhelming list of evidence allegedly withheld by Lamb during Plaintiff's criminal trial. Upon close analysis of each individual allegation, however, it becomes clear that the evidence was either not withheld by Lamb, not within Lamb's actual knowledge, or not favorable or materially exculpatory for Plaintiff. Consequently, Plaintiff has failed to set forth evidence sufficient to support a finding that his Fourteenth Amendments rights were violated and Lamb is entitled to summary judgment.

## IV. Municipal Liability

Plaintiff has also set forth a claim of municipal liability alleging that Macomb County policies and customs caused his constitutional rights to be violated. To succeed on a municipal liability claim, a plaintiff must establish that his constitutional or federal rights were violated and that a policy or custom of the municipality was the moving force

---

[16]Szlezyngier, the CPS caseworker who investigated Rachael's 1987 allegations against Plaintiff and 1988 allegations against Susan and Gary Schwartz, testified at her deposition that, unlike allegations of sexual abuse, allegations of physical abuse were not routinely reported to law enforcement. (Pl.'s Resp. Ex. 13 at 84.) Szlezyngier also testified that the criminality of the 1988 allegations would depend on the totality of the circumstances and that she could not recall whether she forwarded the allegations to law enforcement. (*Id.* at 67-69.)

behind the deprivation of the plaintiff's rights.  *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 606-07 (6th Cir. 2007).   Because Plaintiff has failed to establish a violation of his federal rights, his claim against Macomb County must also fail.  Therefore, Macomb County is entitled to summary judgment.

## V. Motions to Strike

The only remaining issues before the Court are requests by the parties to strike exhibits submitted by their opponents.  In deciding the motion for summary judgment, the Court did not refer to or rely on any of the opposed exhibits.  Therefore, the Court denies all motions and requests to strike as moot.[17]

## VI. Conclusion

After being granted an opportunity to conduct limited discovery, Plaintiff has failed to present evidence establishing a genuine issue of fact regarding his claims.  Because the evidence fails to establish the existence of a constitutional violation, defendants are entitled to summary judgment.

Accordingly,

**IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that defendants' motion to strike Plaintiff's exhibits and Plaintiff's request that the Court strike defendants' exhibits are **DENIED** as moot.

A judgment consistent with this opinion shall issue.

---

[17]Defendant's moved to strike exhibits 31, 34, and 45 attached to Plaintiff's response brief.  Plaintiff requested that the Court strike exhibits J and K attached to Defendants' reply.

s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Andre M. Sokolowski, Esq.
Michael Daoudi, Esq.
Kenneth L. Lewis, Esq.
Randal M. Brown, Esq.